## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

| | |
|---|---|
| **JAMES L. WILLIAMS,** *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )   **Civil Action 8:16-cv-00058** |
| | ) |
| **CORELOGIC RENTAL PROPERTY** | ) |
| **SOLUTIONS, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL

TABLE OF CONTENTS

Page

Introduction ........................................................................................................1

Procedural Background ......................................................................................5

Argument ...........................................................................................................8

I.  Plaintiffs' "database" discovery with respect to the class claims asserted under 15 U.S.C. § 1681e(b) is massively overbroad and unduly burdensome.................................9

    A.  Plaintiffs' requests for the production of the databases should be denied...........11

    B.  There is no basis to compel the production of RPS's "algorithms." ...................18

    C.  No further production for the "Crimcheck America" class is warranted ............20

II.  The withheld documents regarding RPS's internal analysis of its matching procedures are irrelevant and privileged ........................................................20

    A.  The documents regarding RPS's internal review are irrelevant ........................22

    B.  The documents have been properly withheld due to attorney client privilege .....................................................................................24

        i.  The standard for the application of the attorney-client privilege ............25

        ii.  The documents are subject to the attorney-client privilege.....................26

    C.  The documents are shielded from disclosure under the self-evaluative privilege .....................................................................................29

        i.  The information is a direct result of internal review to evaluate procedures...................................................................................30

        ii.  The review of the matching logic is confidential ....................................30

        iii.  The flow of beneficial information would be curtailed if discovery were allowed ..................................................................................31

    D.  There has been no "waiver" of privilege ...........................................................32

III.  Plaintiff is not entitled to discovery on "net worth" at this early posture .......................33

IV.  No response to Interrogatory No. 13 is proper or required at this time............................34

V.  Plaintiffs' objections to RPS's ESI review process are unfounded..................................35

Conclusion .......................................................................................................35

Defendant, CoreLogic Rental Property Solutions, LLC ("RPS"), by counsel, submits this memorandum in opposition to Plaintiffs' Motion to Compel.  (Dkt. No. 47.)

### INTRODUCTION

In their discovery demands Plaintiffs make *no attempt* to tailor their discovery requests to the substance of their claims – as required under Fed. R. Civ. P. 26(b).  Plaintiffs have asserted narrow and technical claims against RPS that concern very discrete aspects of its provision of screening reports.  Relative to these specific claims, RPS has produced to Plaintiffs documents and responses detailing its operations and the technological processes associated with those operations, including all documents relating to both Plaintiffs and the disputed items in their reports; a written description of the matching processes used to generate their reports; documents that thoroughly describe the structure of RPS's databases, and a document explaining changes made to the "matching" process before Plaintiffs' reports were prepared.

In their Motion, Plaintiffs make no mention of the discovery that RPS has already provided, let alone explain why this discovery is insufficient.  Instead, Plaintiffs ask this Court to require RPS to produce all of its intellectual property which would permit them (and anyone else) to re-create the RPS product, even though the vast majority of functions and consumer data demanded have no relevance.   Plaintiffs must abide by the relevance and proportionality limitations required by Fed. R. Civ. P. 26(b).  Having failed to do so, the Motion must be denied. For the reasons below, the internal review documents and "algorithms" should not be compelled. For the database issues, Plaintiffs should, at a minimum, be required to serve new requests or modify their existing request to comply with the applicable rules, taking into account the information already produced by RPS and the limited, narrow focus of their claims.

Plaintiff Hernandez alleges two class claims addressing very specific circumstances under 15 U.S.C. § 1681e(b), claiming that: (1) RPS listed "duplicate" records on his report; and

(2) that RPS "misreported" the name associated by the government agencies with those records. Both Plaintiffs also allege putative a class claim under 15 U.S.C. § 1681g(a), arguing that by listing the trade name of "Crimcheck America" on the heading of the reports, RPS misidentified the "source" of the information included in the response to their file disclosure requests.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Those broad requests are not at all linked to the narrow claims asserted.  As detailed below, the data requests would also create exceptional burdens on RPS. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

Plaintiffs have also asserted individual claims under § 1681e(b), alleging that their reports reference criminal offenses that do not belong to them.  RPS has provided Plaintiffs with all of the information in its possession that relate to these reports, including a description of the procedures used to prepare them. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

Although the Plaintiffs have pled individual § 1681e(b) claims, they have not identified what, if any, aspect of RPS's procedures they believe were unreasonable as applied to their reports.  Instead, they seek to compel the production of all materials associated with the ongoing review conducted by RPS of its matching process generally.   The requested materials have no relevance to the two reports that are the subject of the individual claims, including because the documents that are sought concern only internal discussions that either: (1) resulted in changes which pre-dated the two reports at issue; or (2) concern studies that were not completed until after the reports were issued, and which have not resulted in any changes to the matching logic.

These materials are also privileged.  Subject to its relevance objections, RPS provided Plaintiffs with a detailed privilege log in a good faith effort to resolve the discovery dispute. Those logged documents encompass the latest steps in a continuous internal review of RPS's compliance with the FCRA and other applicable laws undertaken in conjunction with RPS's legal department.

Section 1681e(b) of the FCRA requires consumer reporting agencies to maintain reasonable procedures to assure maximum possible accuracy in the preparation of consumer reports.  For RPS, complying with this section involves balancing the risk of two types of inaccuracies – "false positives," which occur when a report includes data that is not attributable to the subject; and "false negatives,"[1] which occur when a report fails to include data that is

---

[1] As this Court has recognized, "criminal history information is an important, and in many cases essential, part" of the background screening process.  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 786 (D. Md. 2013). Indeed, failing to detect prior convictions can lead to tragedy.  In *Beverly v. Diamond*, a mentally-disabled woman was raped by a newly hired bus driver who was not required to undergo a background check, despite his criminal history.  [http://www.ca4.uscourts.gov/opinions/Unpublished/982230.U.pdf.]  Similar tragedies have also arisen in the tenant context.  *See, e.g., Ponticas v. K.M.S. Inv.*, 331 N.W.2d 907 (Minn. 1983) (sexual assault verdict for negligent screening).

attributable to the subject.  In reviewing its procedures, RPS must not only consider these and other legal obligations of the FCRA, but also the many other laws and regulations that impact it and its customers, including laws regulating the data that landlords can collect on applicants (*e.g.*, the federal Fair Housing Act, Title VII), as well as the many privacy regulations limiting the personal identifying information that can be made available by jurisdictions and then used by RPS for matching purposes.

Thus, the process of matching criminal record data to information provided by customers is inherently legal in nature.  As noted above, it is also highly complex and technical.  For these reasons, RPS's review of its matching processes have necessarily involved not only attorneys for the company, but also business and technical experts.  Courts within the Fourth Circuit have recognized that the attorney-client privilege applies under these circumstances.  The materials at issue are also protected under the self-evaluative privilege, which this court has recognized.  Indeed, candid and self-critical discussions around issues like balancing the various risks inherent to background screening is precisely what the attorney-client and self-evaluative privileges were meant to encourage by providing protection from compelled discovery.

The remaining discovery issues raised by Plaintiffs are also without merit.  There is no basis to compel the production of a sample of the file disclosure database for the "Crimcheck America" claim, which suffers from the same defects as Plaintiffs' other database requests.  Also, Crimcheck America is not a separate entity but a former trademark for RPS criminal record searches.  Also, as recognized by numerous other courts, the production of net worth information can (and should) be delayed in cases such as this.  The same is true with respect to Plaintiffs' class certification contention interrogatories.  Finally, Plaintiffs' claim that RPS has not demonstrated that its ESI search was effectively designed is factually false, and Plaintiffs were fully informed before filing their Motion of what documents are currently being withheld.

Plaintiffs have been provided with sufficient information to continue with the discovery process. Instead, Plaintiffs insist on pursuing sweeping, disproportional requests that ask RPS for everything in huge databases that comprise core operations of RPS, proprietary algorithms, and unrelated and privileged. This Court should take this opportunity to enforce what the recent changes to the text of Rule 26(b) mandate: that discovery must be "proportional to the needs of the case" and relevant to the specific claims asserted.

## PROCEDURAL BACKGROUND

Plaintiffs have asserted three narrow class claims. First, Plaintiffs claim in Count II[2] has nothing to do with the accuracy of information reported by RPS. Instead, this claim deals with a technical aspect of the FCRA in that Plaintiffs allege RPS "misleadingly" listed "Crimcheck America" as a "source" of apparently all criminal records in responding to their "file" disclosure requests in January 2015 and January 2016. "Crimcheck America" is a trade name formerly used by two predecessor-by-merger companies to RPS. **Exhibit 1**. It is not a separate entity that was "misleadingly" disclosed to Plaintiffs. Even more, Plaintiffs make that claim of "deception" despite the fact that Plaintiffs had already identified RPS as the entity that provided the report and had reached out to _RPS_ to lodge disputes prior to requesting their files. (Am. Compl. ¶¶ 33, 47.) As third-party discovery has further demonstrated, RPS was also the entity listed on the adverse action letters sent to Plaintiffs by the landlords and identified therein as the company that ran the reports. The reports themselves disclose they were generated by RPS, with the first page of the report stating it was prepared by "CoreLogic SafeRent"[3] and listing RPS's address.

---

[2] That purpose of the disclosure requirement under § 1681g(a)(2) is to "allow consumers to identify inaccurate information in their credit files and correct this information" by contacting the "source" that reported the information. _Gillespie v. Equifax Info. Servs., LLC_, 484 F.3d 938, 941 (7th Cir. 2007). Plaintiffs' alleged "matching" issues were with SafeRent _alone_. The interest underlying § 1681g(a)(2) on processing disputes is simply not implicated by the facts pled here vis-à-vis Plaintiffs' "source" claims.

[3] CoreLogic SafeRent was the business name of RPS prior to a formal name change in May 2016.

Indeed, neither Plaintiff alleges particularized or concrete "harm" caused by printing the trade name "Crimcheck America" on their file disclosures. *Spokeo, Inc. v. Robins*, 2016 U.S. LEXIS 3046, at *14 (May 16, 2016). Such a claim of "harm" is not possible, as Plaintiffs were aware when they made the file disclosure requests that *RPS* generated their reports. RPS nevertheless conducted an extensive search to determine whether there were documents relevant to its use of the "Crimcheck America" name. It found none and informed Plaintiffs as such.[4] **Exhibit 2**.

Plaintiff Hernandez also alleges two additional class claims in Count I under 15 U.S.C. § 1681e(b), which implicate narrow subsets of consumers, but which then form the basis for the broad discovery demanded by Plaintiffs. First, Plaintiff Hernandez claims that RPS reported "duplicate" criminal convictions on his screening report, despite the fact that the two records came from different government agencies, as well as the fact that each record contained information that was not reflected in the other. (*See* Pltfs' Mem. at Ex. 1 at pp. 1-5.) Plaintiffs do not explain why reporting divergent records from different government agencies is not maximum possible accuracy under § 1681e(b), especially where (as alleged here) it was obvious the two items involved the same offense, *i.e.*, there was no inaccuracy. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████.[5] *See id.* Despite that production, Plaintiffs have made no attempt to ask for information specific to the narrow claim and instead demanded untargeted and random database discovery. Plaintiffs' demands are neither tailored nor proportional.

---

[4] Plaintiffs likewise claim that RPS failed under § 1681g(a) to identify the "sources" of the individual records that appeared on their report, despite RPS having identified the jurisdiction where they originated. Yet, the entities that provided the records to RPS have also been fully disclosed, along with any applicable contracts between those entities and RPS. *See id.* at pp. 1-5, 17. There is nothing further to discover on that issue, and no further discovery is sought in that regard in this Motion.

[5] RPS also confirmed to Plaintiffs that the documents currently withheld on the basis of relevance and privilege do not implicate this claim of "duplicate" reporting. *See* Ex. 1.

Second, Plaintiff Hernandez claims that RPS "misreported" the name associated with the records by identifying the match of the record based on one of the names identified by the government agency, "Hector David Hernandez."   RPS provided Plaintiffs with the complete history of the records it had received from its governmental sources, including the names that were previously associated with the record by each government agency (one of which names was "Hector David Hernandez").  (Pltfs' Mem. at p. 7.)  RPS further provided those records, as they reside in the relevant database.  *See id.*   Again, however, Plaintiffs made no effort to serve proportional database discovery requests targeted to obtain information specific to his claims or explain why the information already produced was insufficient.

Both Plaintiffs also have included individual claims under 15 U.S.C. § 1681e(b) that RPS did not employ "reasonable procedures" in connection with the preparation of the criminal record portion of their background screening reports.   RPS contests those individual claims, along with Plaintiffs' mischaracterizations of its processes, which have resulted in an exceptionally-low dispute volume (less than 2%).  (*See* Pltfs' Mem. at Ex. 1 at pp. 1-5.)  Also, the processes that were used in connection with Plaintiffs' individual reports have been fully detailed in the production so far, and will undoubtedly be further explored in depositions.  *Id.* Hence, any assertion that further documentation is needed to explain RPS's "matching" process to understand the two reports at issue is mere pretext and certainly not proportional to the importance of the issue and needs of Plaintiffs in relation to the burden placed on RPS.   Indeed, while RPS prepared the second privilege log in a good faith effort to resolve this issue, even the creation of the log of documents irrelevant to Plaintiffs' individual claims was disproportional.

To date, RPS has provided Plaintiffs with the following information and documents in response to their requests for production and interrogatories:

- The documents in RPS's possession specific to both Plaintiffs; both internally and with respect to the data RPS received from its government sources;

- Documents reflecting the file structure of the relevant databases;

- Contracts with the entities that provided the identified criminal record data;

- A narrative description of the process used to match the records from RPS's database to the information provided by Plaintiff's leasing agent;

- Documents describing the process used by RPS to link the records from its database to the identifying information provided by the leasing agents;

- A document explaining the technical changes made to the "matching" process in October 2014, along with the statistical impact of such changes;

- A representation that there have been no changes to RPS's "matching" process from the time that Plaintiffs' report was generated to the present date;

- An identification of witnesses with knowledge of the claims asserted;

- A screenshot showing the processes by which the criminal record database maintained by RPS can be searched by its leasing agent customers; and

- A "data dictionary" for the criminal record database maintained by RPS.

RPS further provided Plaintiffs with a timesheet showing its extensive electronic discovery efforts, along with a description of the 10 custodians searched and the many search terms that were used across the five-year period of the electronic discovery review. Ex. 1; **Exhibit 3**. RPS also provided a privilege log itemizing the documents being withheld. (*See* Pltfs' Mem. at Ex. 12.) Plaintiffs' Motion provides none of this context.

## ARGUMENT

Fed. R. Civ. P. 26(b)(1) permits discovery only of a "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "[T]he requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied . . . . [J]udges should not hesitate to exercise appropriate control over the discovery process." *Herbert*

*v. Lando*, 441 U.S. 153, 177 (1979).  "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case."  *Ash Equip. Co. v. Morris*, 2016 U.S. Dist. LEXIS 98464, at *7 (D.S.D. July 28, 2016).

Further, even if information or materials qualify as "relevant" under Rule 26(b)(1), the scope of electronic discovery is limited under Rule 26(b)(2).  Rule 26(b)(2)(B) limits discovery of electronically stored information ("ESI") to that which is "reasonably accessible[.]"  Rule 26(b)(2)(C) further limits discovery, providing that "the court *must* limit" discovery that is "unreasonably cumulative" or otherwise outside the scope of Rule 26(b)(1).  That rule "cautions that all permissible discovery must be measured against the yardstick of proportionality."  *Elliott v. AMS, Inc.*, 2016 U.S. Dist. LEXIS 109970, at *9 (S.D. W. Va. Aug. 17, 2016).

Plaintiffs' demands that are the subject of their motion, both generally and with respect to ESI, violate these principles and should not be compelled.  Instead, for the requested database discovery, Plaintiffs should abide by the rules and serve discovery that is limited to the issues in dispute (as informed by the substantial discovery already provided by RPS), and proportional to their claims.  That is their burden as proposed class counsel if they are truly adequate under Fed. R. Civ. P. 23(a)(4); not the task of the Court or RPS.  To the extent there is any uncertainty as to the database details already provided by RPS, Plaintiffs should have pursued deposition practice rather than filing the pending Motion with the hopes of stumbling onto relevance, either to this case or for future cases.  The Motion also should be denied outright as to the remaining issues.

## I.     Plaintiffs' "database" discovery with respect to the class claims asserted under 15 U.S.C. § 1681e(b) is massively overbroad and unduly burdensome.

The classes pled under § 1681e(b) by Plaintiff Hernandez are defined as follows in the Amended Complaint:

- *Misreported Name*: "All individuals who were the subject of a consumer report furnished by Defendant in the five years predating the filing of this Complaint and continuing through the date the class list is prepared and for whom Defendant reported a criminal offense for which the name reported for the offense in Defendant's published report does not match the name associated with the record Defendant obtained from its source."

- *Multiple Entries*: "All individuals who were the subject of a consumer report furnished by Defendant in the five years predating the filing of this Complaint and continuing through the date the class list is prepared and for whom Defendant reported the same criminal incident more than once in a report."

(Amend. Compl. ¶ 82.)  Those classes thus define the boundaries of relevance in discovery.



Plaintiffs make no attempt to explain why all this information is needed.  Nor do they explain how they would go about using this data to ascertain any class as currently defined or how they would protect this information and otherwise not invade the privacy of the vast majority of the individuals whose information is included in the data sets, but who would not be a member of any class.

Indeed, Plaintiffs' process of asking for everything without consideration to relevance or proportionality cannot be endorsed, especially in light of the information already provided in discovery.  This is a paradigm example of an impermissible fishing expedition.

---

[6] Plaintiffs made those extraordinary requests despite the ever-updating nature of the databases, such that what is being requested now may not have been the same data that existed at the time a report was issued.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████  RPS also produced all of the record transmissions it had received from the Texas agencies implicated by the records challenged by Plaintiff Hernandez, including all of the names that had been associated with those records over time by those jurisdictions.  (*See* Pltfs' Mem. at Ex. 7.)  Plaintiffs had all information that they could have needed to craft targeted data discovery.  Yet, they did not do so and instead filed a Motion to Compel.  The requests for unfettered database access must be denied.

### A.    Plaintiffs' requests for the production of the databases should be denied.

It is well settled that there is a general reluctance to allow a party to access its adversary's databases directly.  The Advisory Committee Notes to the 2006 Amendments to Rule 34 explain that Rule 34(a) is not meant to "create a routine right of direct access to a party's electronic information system" and advises that courts "guard against undue intrusiveness resulting from inspecting or testing such systems."  Thus, courts have consistently declined to find an automatic entitlement to access an adversary's database.  *Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 954 (10th Cir. 2004) (unduly burdensome to compel access to defendant's computer databases).

Plaintiffs' requests for unfettered database access should be denied for multiple reasons.  <u>First</u>, the requests are facially overbroad.[7]  Plaintiffs' class claims under § 1681e(b) are narrow in scope and only implicate consumers where RPS allegedly reported "the same criminal incident" on two or more records within a report, and those consumers where RPS allegedly reported a "name" that was different than that reported by the jurisdiction.  For both § 1681e(b) classes, however, Plaintiffs' database proposal is not limited in any way.  (*See* Pltfs' Mem. at pp. 10-11.)

---

[7] Indeed, the frequency by which Plaintiffs' counsel file FCRA lawsuits, and the fact that they have been using discovery from other cases in this action, reveals their desire to seek broad discovery for its own sake in the hopes of finding something of use in this case and/or to foster future lawsuits.

For instance, the database requests would include consumers for which RPS reported: (1) criminal records that have never been associated with multiple names by the jurisdiction, such that there would be no possible basis for the "misreported name" claim; (2) criminal records from different states/years, such that "duplication" was not possible, etc.  Plaintiffs made no attempt to link their requests to the substance of their claims, as was their duty under Rule 26(b). The requests are facially overbroad and must be rejected, including because they would require the production of private information on *millions* of consumers who are not implicated by this case.  *See, e.g., Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ.*, 2016 U.S. Dist. LEXIS 8952, at *5 (E.D. Cal. Jan. 26, 2016) ("This apparently requests the production of every database, and every data point in the database, and is overbroad on its face.  The motion will be denied as to this request."); *Cummings v. GMC*, 2002 U.S. Dist. LEXIS 27627, at *22-26 (W.D. Okla. June 18, 2002) (rejecting requests for "database" production that was "nothing more nor less than an attempt to rummage around in Defendant's files"); *see also Bradford v. WR Starkey Mortgage, LLP*, 2007 U.S. Dist. LEXIS 60612, at *4 (N.D. Ga. 2007) ("[I]f a case has not yet been certified as a class action, a request to compel discovery on a putative class is overly broad and unduly burdensome when . . . th[e] responsive documents contain highly confidential personal and financial information of borrowers who are not parties to this case.").

Second, because they are not tailored in any meaningful way, it necessarily follows that the requests for database discovery on Count I are not limited to the data points implicated by Plaintiff Hernandez's own reports, as required.  "It is axiomatic that the lead plaintiff must fit the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013).  Thus, any attempt to ascertain a class across databases of information must be executed by reference to a search query that implicates the criminal record data points for the named plaintiff.  *See id.* Plaintiffs, however, did not limit their database requests in that way.  For instance, with respect

to the "duplicate reporting" class, the records that are claimed by Plaintiff Hernandez to be duplicates came from different jurisdictions: the Texas Department of Corrections, which provides information on incarcerated inmates; and the Texas Department of Public Safety, which provides records of court proceedings. (*See* Pltfs' Mem. at Ex. 1 at pp. 1-5.)  The two records also contained non-overlapping information. (*Id.*; *see also* Amend Compl., at Ex. 2.)  Indeed, it is not even clear what constitutes a "duplicate" record to Plaintiffs that allegedly violates the requirements of the FCRA, let alone how the database demands will allow them to meet their ascertainability burden.  Further, with regard to the "misreported name" class, it is questionable whether Plaintiff Hernandez is in his class, as Texas Department of Corrections reported "Hector David Hernandez" as the name of the offender in one of its updates, which is what was reported by RPS.  Even apart from these issues, however, the requests for the production of the databases are not tailored to Plaintiff Hernandez's report and the data points implicated by that reporting, as reflected in the database samples produced by RPS.  Thus, the database requests are improper.

[redacted]

[redacted]

---

[8] Disclosure of RPS's processes could also be valuable to applicants seeking to avoid their criminal past by creating "false negative" reports to avoid the return of accurate criminal records by RPS.

[9] "One gigabyte is the equivalent of 500,000 type-written pages." *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 654 (M.D. Fla. 2007).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

    <u>Fifth</u>, Plaintiffs seek the databases under the premise that such discovery is necessary to "ascertain" the two classes.  Yet, Plaintiffs have not even attempted to tailor their requests to account for any of the ascertainability issues that exist in this case.  For example, even if Plaintiff Hernandez had some way of ascertaining the "misreported name" class from RPS's databases, individualized mini-trials would be required to determine if the record reported was attributable to the subject of the report, notwithstanding any variation in name.  Indeed, proof of inaccuracy is an element of the claim, and courts have consistently denied class certification for that reason alone.  *See, e.g.*, *Gomez v. Kroll Factual Data, Inc.*, 2014 U.S. Dist. LEXIS 51303, at *10-12 (D. Colo. Apr. 14, 2014) (explaining that an individualized inquiry is required for "each putative class member . . . to prove that the information in the report . . . was inaccurate").[10]  Also, the assessment of whether an allegedly "duplicate" record is "inaccurate" and had any impact on a

---

[10] There are *many* like decisions nationwide.  *See, e.g.*, *Owner-Operator Independent Drivers Ass'n v. USIS Commerical Svcs, Inc.*, 37 F.3d 1184, 1194 (10th Cir. 2008) (affirming denial of certification and district court's ruling that "the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, required a particularized inquiry"); *Harper v. Trans Union, LLC*, 2006 U.S. Dist. LEXIS 91813, at *8-9 (E.D. Pa. Dec. 20, 2006) (same).

consumer requires case-by-case review.  *See Lewis v. Trans Union, LLC*, 2013 U.S. Dist. LEXIS 55160, at *11-12 (E.D. Cal. Apr. 16, 2013) (dismissing a "duplicate" reporting claim: "Lewis allege[d] that TransUnion's reporting Lewis' debt with Sears as two entries in the credit document misrepresents Lewis as owing two different debts in that amount and is therefore misleading . . . .  No lender reviewing this document with due care could reasonably interpret these entries as representing two different debts.").  Plaintiff Hernandez confirms that point by pleading that the fact "that the two cases were the same is evidenced by the fact that the items have the same tracking number," which the landlord also would have seen.  (Amend. Compl. ¶ 30.)  Plaintiffs' requests account for none of the above issues, nor do Plaintiffs explain how their requests will lead to discovery of an ascertainable class.  They should be denied.

These conclusions are not altered by the Declaration of Jonathan Jaffe, who has no first-hand knowledge of RPS's data systems, and whose declaration – although wordy – is devoid of meaningful content.  (*See generally* Pltfs' Mem. at Ex. 6.)  Mr. Jaffe makes numerous, quasi-legal statements that lack foundation, and which have no factual support.  A few examples include: that he is somehow familiar with how all "Credit Reporting Agencies" generally "store and structure, Applicant, Offender and Offense data," although lacking knowledge as to RPS's systems, *see id.* at ¶ 4; Plaintiffs are seeking a "reasonable export," *see id.* at ¶ 9; "Plaintiff Hernandez had a duplicated charge," *see id.* at ¶ 17; his belief that date of birth matching is a "poor disqualifier," *see id.* at ¶ 15 (without accounting for the fact that RPS does not match records on date of birth alone or use it as a "disqualifier"); and that Plaintiffs need the databases "to identify and count class members," but not explaining how or why.  *Id.* at ¶ 17.  Indeed, Mr. Jaffe testifies about the members of the "Class," *see id.* at ¶¶ 50-61, without any differentiation among the three classes.  His "opinions" and "conclusions" that follow from his descriptions of the RPS databases and characterizations of RPS's operations are not linked to preceding "facts"

16

recited or the claims plead. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Moreover, the other transcripts and orders provided by Plaintiffs in support of their contention that the expansive database discovery should be ordered here only underscore the need to deny Plaintiffs' Motion.  (Pltfs' Mem. at p. 5.)  In *Rodriguez v. Equifax Information Services*, the court considered the production of a two-month sample of data that was specific to the "1681k information" identified by the defendant.  (Pltfs' Mem. at Ex. 3.)  Thus, the request was both specific to the claims in the case and limited in time, unlike here.  The *Manuel v. Wells Fargo* Order cited is devoid of both content and context.  (*See* Pltfs' Mem. at Ex. 5.)  The *Ridenour v. Multi-Color Corporation* case also implicated only a four-month sample of data that was limited to the "potential class-member[s]."  (Pltfs' Mem. at Ex. 5.)  The *Ceccone v. Equifax Information Services* decision involved the production of a mere 100 files that actually involved the "lien"-related issue that was the subject of the dispute.  2015 U.S. Dist. LEXIS 6474, at *3-4 (D.D.C. Jan. 15, 2015).  *Henderson v. CoreLogic National Background Data, LLC* involved the *voluntary* production of a single database that included only potential class members.  (*See* 3:12cv97, E.D. Va. 2013 at Dkt. No. 49.)  Finally, the decision in *Qualcomm Inc. v. Broadcom Corp.* involved the application of search terms against a database, not the production of the database.  *See* 2007 U.S. Dist. LEXIS 17797, at *3-4 (S.D. Cal. Mar. 13, 2007).

For these reasons, Plaintiffs' database demands should be rejected.  Any further data discovery must be the product of tailored and proportional requests that are conformed to the information provided by RPS in discovery and the actual claims and class definitions.

**B.      There is no basis to compel the production of RPS's "algorithms."**

[redacted]

In recognition of the obvious sensitivity of such information, courts have determined that "for [a] plaintiffs' request [for source code disclosure] to be granted, the entire Source Code must be relevant to plaintiffs' . . . claim and the benefits of disclosure must outweigh the considerable detriment invoked by defendants." *Abarca Health, LLC v. PharmaPix Corp.*, 806 F.Supp.2d 483, 487 (D.P.R. 2011).  Plaintiffs have not met that exacting standard here for multiple reasons.

As a preliminary matter, with respect to both requested types of "algorithms," all of Plaintiffs' claims depend on the delivery of a report to a landlord and the substance of that report. *See, e.g., Wantz v. Experian Info. Solutions, Inc.*, 386 F.3d 829, 834 (7th Cir. 2004) ("[W]here there is no evidence of disclosure to a third party, the plaintiff cannot establish the existence of a consumer report."). [redacted]

[redacted]

[redacted]

**C.     No further production for the "Crimcheck America" class is warranted.**

Plaintiffs also request the production of a four-month database sample with respect to the "file disclosure" database at RPS to ascertain their "Crimcheck America" class.  (Pltfs' Mem. at p. 11.)  For the reasons noted above, the "Crimcheck America" class is groundless.  Regardless, Plaintiffs have demanded a series of "stipulations" that far exceed the contours of the class claims pled in the Complaint, which requires only that the "Crimcheck America" name appear on the document.  (Pltfs' Mem. at p. 11.)  Again, Plaintiffs have not tailored their broad demands to their narrow claim.  Moreover, Plaintiffs' alternative proposal for discovery of RPS's "file disclosure" database suffers from all the same infirmities mentioned above.

RPS can provide Plaintiffs with the parameters by which the "Crimcheck America" trade name appeared on file disclosures.  However, because of the lengthy nature of the five-year class, RPS is continuing to determine whether its systems permit a stipulation of ascertainability, as it is unclear when the trade name was in use and under what circumstances.  If such a stipulation is not possible, Plaintiffs can depose RPS's staff and either shorten the time frame of their putative class or further brief the issue.  But, the database sample should not be compelled.

**II.     The withheld documents regarding RPS's internal analysis of its matching procedures are irrelevant and privileged.**

Plaintiffs have also made no effort to tailor the discovery requests that relate to their individual claims under § 1681e(b).  The documents demanded under Request Nos. 4-6, and 22 regard RPS's internal discussions about its matching processes generally, with no indication of what aspects (if any) of RPS's matching processes are relevant to the alleged inaccuracies in the two plaintiffs' reports.  RPS objected to these requests on the basis of relevance and privilege and, subject to and without waiving those objections, fully explained the processes it used with respect to Plaintiffs' individual reports, and produced documents relevant to those processes.

After meet and confer discussions, RPS supplemented its responses with a privilege log (subject to relevance objections) in an effort to resolve the dispute.   Plaintiffs now seek to compel all of the documents on that log, ignoring that they have no bearing on the individual claims at issue.   Indeed, in their Motion, Plaintiffs seek internal documents across multiple years, regardless of whether any of the documents sought relate to the individual claims at issue.   For instance, they seek documents regarding processes that were in place when the Plaintiffs' reports were issued, as well as studies that had not yet been completed when either report was issued.

In contrast to the narrow individual claims at issue, Plaintiffs' requests are exceptionally broad, encompassing years of privileged materials relating to a broad and sensitive topic – RPS's review of its matching processes to assure maximum possible accuracy with regard to the elimination of both "false positives" and "false negatives."   From before 2012 to the present, RPS's attorneys have provided advice on its procedures to assure maximum possible accuracy in compliance with the FCRA.   For example, and as reflected on the privilege log, RPS conducted a review of its matching process in 2014, which involved technical experts and legal counsel, and which resulted in certain changes to its matching procedures in late October 2014 (internally referred to as "Phase 1" of the review).   *See* Declaration of David Diehl, **Exhibit 6**, at ¶ 6.   Those changes were thus in place before Plaintiffs' reports were transmitted in January 2015 and in January 2016.[12]   In 2015-16, RPS again engaged in a further review of its matching processes with the assistance of CoreLogic's Decision Analytics & Research Team ("DART").   *Id.* at ¶ 7.   The technical analysis of the DART team was distributed on March 17, 2016 to RPS's counsel and compliance team, and remains under active review by the legal department and compliance team.   *Id.* at ¶¶ 7-8.; see Declaration of Jennifer Savradi, Esq., attached as **Exhibit 7**, at ¶ 7; Declaration of Rebecca Kuehn, Esq., attached as **Exhibit 8**, at ¶ 7.   Given the technical nature of

---

[12] Those October 2014 changes have been disclosed, including in a finalized policy document.

the process, DART's expertise was required to provide factual information to RPS's attorneys to provide legal advice.  No further changes to the matching processes have yet been made at RPS, and none will be made without the approval of the legal department.  Ex. 6 at ¶ 9.  For the reasons that follow, the documents are irrelevant, and they are also privileged.[13]

### A.       The documents regarding RPS's internal review are irrelevant.

In the context of an individual claim, Plaintiffs seek the production of all documents regarding RPS's internal review of its matching process over a period of more than four years, regardless of whether those documents have any possible relation to the two reports at issue in this case.  RPS objected, including on the basis that those documents are not relevant to Plaintiffs' individual claims under § 1681e(b), as well as privilege, and provided reasonable responses subject to its objections.  After meet and confer discussions, RPS prepared and provided a privilege log in a good faith attempt to resolve this discovery dispute.  But, Plaintiffs have only used that accommodation to demand even more discovery that is not proportional to the issues in this case.

Plaintiffs bear the burden of proof for their claims under § 1681e(b).  *Jianqing Wu v. Trans Union*, 2006 U.S. Dist. LEXIS 96712, at *19 (D. Md. May 2, 2006).  And, it is well established that "an objective standard is used to assess whether a credit reporting agency has in place and followed reasonable procedures to assure that its credit reports achieve maximum possible accuracy."  *Villaflor v. Equifax Info.* Servs., 2010 U.S. Dist. LEXIS 83314, at *4-5 (N.D. Cal. July 21, 2010) (internal citations omitted).  Accordingly, the reasonableness of the procedures used by RPS must be assessed by reference to the *procedures themselves*, which are what define the relevant inquiry, and not any internal commentary on those procedures.

---

[13] For these reasons, RPS will not rely on these documents at trial.

Plaintiffs also have been provided with full information to develop their arguments that RPS should have matched the records in a different way.  Plaintiffs have been provided with the data that the leasing agents used to conduct the search and the personal identifying data points made available by the agencies that provided the public records; and the manner in which the records at issue were included by RPS on the reports.  However, the documents sought regarding the internal discussions of RPS on matching are not relevant to any liability issue in the case.[14]

The irrelevance of the documents is further confirmed by the timing of Plaintiffs' reports relative to the internal analysis conducted by RPS.  First, the internal discussions occurring prior to October 2014, which is when the changes to the matching algorithm were implemented, have no bearing on Plaintiffs' claims.  Those changes pre-dated Plaintiffs' screening reports, meaning that the changes were already in place at the time Plaintiffs' reports were generated.  RPS has already produced documents that describe these changes.  The privileged communications that predated these changes have no relevance to the Plaintiffs' reports.[15]

With respect to the internal discussions occurring after October 2014, relevance is also absent.  The "study" referenced by Plaintiffs in their Motion that reflected the results of the technical analysis of the DART team that was internally distributed for further review in mid-March 2016.  Ex. 5 at ¶ 7.  That analysis was not available to RPS at the time Plaintiffs' reports

---

[14] Indeed, other than a broad claim that Plaintiffs' reports were inaccurate, Plaintiffs have not suggested that any alternative reasonable procedures as to matching could have prevented the alleged inaccuracies and have not tailored their discovery requests to address these specific alleged inaccuracies.

[15] Plaintiffs note that, in a separate case involving a different plaintiff and different facts, Magistrate Judge Anderson of the Eastern District of Virginia previously overruled objections as to irrelevance of portions of the "study" and "audit" documents to that case.  RPS submits that this ruling, which has no precedential value here, was in error.  Moreover, Plaintiffs do not point out the significant differences present here that compel a different result.  Magistrate Judge Anderson considered only issues of relevance to the case that was then before him.  He did not rule on any issues of privilege, and the documents would have been logged by RPS had the case not resolved shortly after the hearing.  In fact, Magistrate Judge Anderson further stated that if the documents were going to be withheld on privilege after the hearing, "they need to be logged," just as RPS has done here.

were issued in January 2015 and January 2016, and it thus could not have informed RPS's decision-making process.  That defeats the Plaintiffs' claim that the review documents are relevant to an assessment of "notice" of unreasonable procedures.  *See, e.g., D.W.K. v. Abbott Labs., Inc.*, 87 F. Supp. 3d 916, 926 (S.D. Ill. 2015) ("Since these labels are based on studies/data not available in 1999, they are not relevant to the adequacy of the 1999 label.").

### B.     The documents have been properly withheld due to attorney client privilege.

The criminal record screening reports generated by RPS are regulated by the FCRA and intersect with many other laws and regulations, meaning that RPS's matching processes necessarily raise issues of legal compliance.  RPS uses a proprietary technical process to match criminal records from its database to the personal information on the applicant provided by the landlord.  (Pltfs' Mem. at Ex. 1 at pp. 1-5.)  Nonetheless, RPS remains continuously committed to analyzing its matching procedures to ensure that its processes are reasonably designed to assure maximum possible accuracy.  RPS's commitment in that regard serves two indivisible and interrelated goals: (1) to ensure that RPS's processes are compliant with the FCRA and other applicable laws; and (2) to provide a superior product to its leasing agent customers.  With that context in mind, in addition to being irrelevant, the communications identified on the privilege log[16] are protected from discovery by the attorney-client privilege.

The Supreme Court has recognized that the attorney-client privilege enjoys a special position as "the oldest of the privileges for confidential communications," and that the privilege serves an important purpose: to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The privilege

---

[16] Although not relevant, RPS nonetheless provided a log of these privileged documents.

also protects the effort to permit entities "in obtaining legal advice founded on a complete and accurate factual picture." *United States v. Jicarilla Apache*, 131 S. Ct. 2313, 2321 (2011).

      **i.**      **The standard for the application of the attorney-client privilege.**

To qualify as a privileged communication, the communication must be for the purpose of providing or facilitating the provision of "legal advice," which typically includes when an attorney and/or an individual acting pursuant to his or her guidance is "applying law to a set of facts, reviewing client conduct based on the effect of laws or regulations, advising the client about status or trends in the law, and other similar lawyer-related tasks."  John W. Gergacz, ATTORNEY CORPORATE CLIENT PRIVILEGE § 3.30 (3rd ed. 2016).

However, application of the privilege is not limited to communications that include attorneys.  The attorney-client "privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn*, 449 U.S. at 391.  Thus, "[a] document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.  First, in instances where the client is a corporation, documents subject to the privilege may be transmitted between non-attorneys to relay information requested by attorneys.  Second, documents subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately."  *Santrade, Ltd. v. GE*, 150 F.R.D. 539, 545 (E.D.N.C. 1993).  Also, "[w]hile it is essential that communications between client and attorney deal with legal assistance and advice in order to be privileged, it is not essential that such requests by the client for legal advice be expressed."  *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 37 (D. Md. 1974).  "Implied requests for legal advice" are sufficient.  *Id.*

Further, a communication need not consist solely of legal advice to be privileged. When business and legal advice are "inextricably intertwined," the privilege is present. *See, e.g., In re OM Group Sec. Litig.*, 226 F.R.D. 579, 590 (N.D. Ohio 2005); *Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 446 (E.D. Tex. 2003) ("[L]egal and business issues are often inextricably intertwined. Therefore, in determining whether advice is predominately legal or business in nature, courts should resolve doubts in favor of the privilege."). Finally, the determination of privilege must be made in view of the totality of the circumstances presented. *In re CV Therapeutics, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 41568, at *14-15 (N.D. Cal. June 16, 2006). Hence, when a company is operating in a highly-regulated context and engaging in internal analysis of its regulated operations, the application of the privilege can and should be "fairly be implied" to the relevant communications. *See id.*

### ii.    The documents are subject to the attorney-client privilege.

The privileged status of the withheld documents is established by the accompanying declarations of David Diehl, Rebecca Kueh, Esq., and Jennifer Sarvadi, Esq., as well as the privilege log itself. As demonstrated by that proof, RPS's attorneys and legal compliance personnel have been continually involved in RPS's review of its matching logic. This is understandable given that: (1) RPS's criminal background reports are regulated by the FCRA; (2) its customers are regulated by the Fair Housing Act/Title VII and other laws that bear on the personal data they can collect and provide to RPS; and (3) RPS has to navigate myriad state and local restrictions on what criminal record data can be made public by jurisdictions.[17] *See, e.g.,* Alaska R. of Admin. 37.8; Cal. R. Ct. 2.507 (limiting the personal information that can be

---

[17] The laws and regulations in this space are ever-changing. For instance, the Rhode Island Commission on Human Rights recently interpreted the state's Fair Housing Act to prohibit the collection of an applicant's date of birth due to concerns over age discrimination. The Iowa court system also recently issued a regulation that will prevent courthouses from releasing dates of birth with records. The Secretary of the Supreme Court of Virginia also no longer reports full dates of birth in connection with offenders.

publicly disclosed). Thus, legal compliance is necessarily implicated by any proposed changes to the matching logic, and the legal department is intimately involved in discussions about matching issues for that reason. *See* Ex. 6 at ¶¶ 5-9; Ex. 7 at ¶ 6; Ex. 8 at ¶ 6.

As demonstrated in *In re CV Therapeutics, Inc. Securities Litigation*, documents reflecting such an inherently legal process are privileged. In that case, the defendant was preparing draft FDA filings, which were circulated to both "legal counsel and non-lawyer recipients. 2006 U.S. Dist. LEXIS 41568, at *14. In addressing a claim of privilege with respect to the documents reflecting that undertaking, the court noted that "[d]ocuments created in the context of seeking FDA approval, an inherently legal process, present a circumstance virtually necessitating legal representation, as the FDA approval process requires close supervision by legal counsel." *Id.* at *15. Similarly, the court noted that communications concerning FDA review and approval "presumptively entail the drug manufacturer's ongoing dialogue with its attorneys." *Id.* For those reasons, the court held that "[t]he nature and context of th[e] documents" was "sufficient to establish the privilege." *Id.* The same is true here with respect to RPS's review of its matching logic, which has occurred at the highly-regulated intersection of housing law, the FCRA, and privacy laws.

RPS's internal review of matching issues confirms the inherently legal nature of the matching process and the ongoing need for advice provided by the legal department on matching issues.[18] The privilege log in this case demonstrates that counsel for RPS (Rebecca Kuehn, Jennifer Sarvadi, Thomas King, Thomas Graber, Jeanette White) have been continuously involved in discussions regarding RPS's matching logic throughout the time frame requested by

---

[18] The claim of attorney client privilege can come as no surprise. In connection with a recent prior case against RPS, Plaintiffs' counsel were rebuffed in their efforts to inquire during a deposition into the internal analysis that had been conducted by DART, with RPS's witness (Jason Doyle) stating that he would be unable to testify without disclosing his "attorney-client communications" with RPS's counsel.

Plaintiffs.  (*See* Pltfs' Mem. at Ex. 11.)  The matching review process in 2014 and the changes made in October 2014 were also made in consultation with legal counsel.  Ex. 6 at ¶ 6. Moreover, the legal department at RPS has held frequent meetings to discuss the application of the matching logic.  Ex. 6 at ¶¶ 5-9; Ex. 7 at ¶ 6; Ex. 8 at ¶ 6.  That involvement has included meetings to discuss the application of the matching logic as a result of lawsuits against RPS and other consumer reporting agencies under the FCRA; changes in the record access practices of courts and governmental bodies; publicly available pronouncements by regulators such as the FTC, the CFPB, and the Department of Housing and Urban Development; and compliance issues identified by consumers and customers.  Ex. 6 at ¶¶ 5-9; Ex. 7 at ¶ 6; Ex. 8 at ¶ 6.  Those communications frequently involved non-attorney, subject matter experts who provided details and information about the matching process to aid counsel in the provision of legal advice.  Ex. 6 at ¶¶ 5-9; Ex. 7 at ¶ 6; Ex. 8 at ¶ 6.  Such consistent communication at RPS with respect to matching demonstrates the legal nature of the issue and the consistent need for legal advice.

Further, it is well settled that the technical analysis performed by qualified personnel to inform the provision of legal advice is privileged.  *VISA U.S.A., Inc. v. First Data Corp.*, 2004 U.S. Dist. LEXIS 17117, at *4-5 (N.D. Cal. Aug. 23, 2004) ("courts have extended the [attorney-client] privilege to . . . technical assistance of agents of the attorney.")  As the above analysis aptly illustrates, the matching process implicates data sets consisting of hundreds of millions of records, which are then linked through the application of hundreds of sets of complex codes. Indeed, there simply was no way for the legal department to have obtained the technical analysis needed to inform their further compliance discussions without the engagement the technical experts involved in the 2014 and 2015-16 analysis.  That effort, however, remains privileged.  *Id.*

The privileged nature of the review process is also underscored by the recipients of the technical analysis that was internally distributed by the DART team on March 17, 2016 and the

process undertaken by RPS thereafter.  That analysis was sent to counsel, other members of the compliance team, and senior leadership at RPS for further review and discussion, which evidences that the technical analysis reflected in the earlier communications was for the purpose of facilitating legal advice.  Ex. 6 at ¶ 7.  Since the publication of the study, RPS's review of the matching logic has been principally lead by Shannon Brown, RPS's Director of Compliance and now Vice President of Compliance, who works very closely with the legal department.  Ex. 6 at ¶ 8.  The legal department has relied on the technical analysis and additional interaction with the DART team to provide legal advice and direction to Mr. Brown and RPS.  Ex. 6 at ¶¶ 9-10; Ex. 7 at ¶ 7; Ex. 8 at ¶ 7.  The technical analysis provided by DART remains under active review by the legal and compliance teams at RPS, and it has been the subject of multiple meetings, communications and further discussions with the legal department, including requests by the legal department for additional technical analysis to assist them in formulating their legal advice to the company.  Ex. 6 at ¶¶ 9-10; Ex. 7 at ¶ 7; Ex. 8 at ¶ 7.  Any changes to the matching process will require the approval of the legal department.  Ex. 6 at ¶ 9.

In addition, Plaintiffs' sweeping argument fails to account for the many documents on the privilege log that directly involve counsel.  (Pltfs' Mem. at Ex. 11.)  Also, as noted by RPS – above and on the log – documents describing the assessment of the DART technical analysis after March 17, 2016 were generated in conjunction with RPS's legal and compliance teams, and the legal department has been actively involved in providing guidance relative to that analysis.  Ex. 6 at ¶¶ 9-10; Ex. 7 at ¶ 7; Ex. 8 at ¶ 7.  Plaintiffs provide no basis as to why these documents are not privileged.  Instead, these documents only confirm the propriety of the claim of privilege.

## C.   The documents are shielded under the self-evaluative privilege.

The documents regarding RPS's review of its matching process are also protected from disclosure under the self-evaluative privilege.  The "self-evaluative privilege" is based on a

policy of promoting "candid and forthright self-evaluation." *Granger v. National R. Passenger Corp.*, 116 F.R.D. 507, 509 (E.D. Penn. 1987).  The self-evaluative privilege "requires that: (1) the information sought be the product of an internal review designed to improve procedures; (2) the information be intended to remain confidential so as to encourage the free exchange of ideas; and (3) free exchange would be curtailed if the information was discoverable." *Tyndall v. Berlin Fire Co.*, 2014 U.S. Dist. LEXIS 176533, at *4-5 (D. Md. Dec. 23, 2014); *accord Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A., et al.*, 162 F.R.D. 94, 98 (D. Md. 1995).

### i.      The information is a direct result of internal review to evaluate procedures.

That review process reflected by the documents was designed to conduct a review of RPS's matching logic to assure that its processes were achieving maximum possible accuracy with respect to the requests for tenant screening reports submitted by its customers.  Ex. 6 at ¶¶ 5-8.  The technical analysis provided by DART is currently under review by the legal and compliance teams at RPS and CoreLogic, Inc.  Ex. 6 at ¶¶ 9-10; Ex. 7 at ¶ 7; Ex. 8 at ¶ 7.  Thus, the internal review was conducted for the purposes of assessing RPS's matching procedures.

### ii.     The review of the matching logic is confidential.

The internal review process was also conducted in a highly confidential environment. The team conducting the review was specifically delineated and limited, and access to the review materials was restricted.  Ex. 6 at ¶¶ 11-12.  The internal correspondence by the review team in 2014 and 2015-16 included only those members who were actively involved in the review.  *Id.* The technical analysis that was performed by DART in 2015-16 was internally disseminated only to a small group of employees, including counsel and senior management.  Ex. 6 at ¶ 7. The ongoing confidentiality of that process has been critical to the discussion of ideas across the full spectrum of the data provided by landlords and jurisdictions.

iii.     **The flow of beneficial information would be curtailed if discovery were allowed.**

Requiring the production of the documents Plaintiffs seek would set a precedent that no court should want.  If information of this type is ordered to be produced (despite the involvement of counsel), candid communications among employees about matching issues will be stifled and the review process will be hampered due to the omnipresent threat of litigation[19] in this highly-litigated space.  Open discussions regarding the status of a background screening company's operations, including ways to be keep tenants safe, would be decreased.  *See, e.g., Tyndall*, 2014 U.S. Dist. LEXIS, at *8 ("[T]the public interest in protecting the confidentiality of such information, and thereby ensuring the efficacy of quality assurance reviews is paramount.").

When considering the production of these types of documents, the Court must keep in mind the critical role that background screening companies play in avoiding false negatives, which pose a grave risk to RPS's customers and the general public.  To that end, the Court must consider instances where landlords have failed in their duty to run effective background checks on applicants and where horrific crimes have resulted, and also the untold number of instances where landlords, due to their access to an efficient background check industry, have successfully screened out criminals and avoided those types of crimes.  Candid and ongoing review of a background screening company's matching processes is a critical step in preventing such events.  Indeed, given the proclivity of criminals to evade detection, ongoing discussion on the ways to most effectively conduct tenant screenings is essential.  *See* Center for Identity Management and Information Protection, *Hiding in Plain Sight? A Nationwide Study of the Use of Identity Manipulation by Registered Sex Offenders* (February 2015) (42% of offenders in the National

---

[19] There were more than 1,500 FCRA lawsuits filed last year, including dozens by Plaintiffs' counsel, with many of them putative class actions.  *See* http://www.acainternational.org/news-fdcpa-and-fcra-year-to-date-consumer-litigation-statistics-continue-to-increase-36369.aspx.

Sex Offender Registry have multiple names, social security numbers, dates of birth, or other identity indicators, and that nearly 17% of offenders attempt to manipulate their identities).

That is especially true here in light of the fact that Plaintiffs have all the discovery they need to assess RPS's matching procedures relevant to the two reports at issue in their individual claims.  As noted above, the processes used to generate Plaintiffs' reports have been disclosed.  Based on the information provided, Plaintiffs remain free to develop any argument to claim that RPS's disclosed procedures were unreasonable.  Access to the documents is not necessary for Plaintiffs to fairly litigate their individual claims.  *Brem*, 162 F.R.D. at 102 ("DLHP is free to obtain opinions regarding Dr. Brem from persons whose opinions are based on information other than that which they learned as a result of the error management conferences").

### D.    There has been no "waiver" of privilege.

Plaintiffs end their argument regarding the privileged nature of the withheld documents by asserting that RPS has "waived" privilege.  Plaintiffs advance two arguments in that regard.

<u>First</u>, Plaintiffs claim that RPS "waived" privilege because it did not serve a privilege log with its initial document production.  (Pltfs' Mem. at p. 17.)  That contention is misguided.  For the reasons above, the documents regarding the internal review *<u>are irrelevant</u>* to an objective assessment of the reasonableness of the procedures used by RPS to generate Plaintiffs' reports.

Regardless, as clearly delineated under Rule 26(b)(5), a privilege log is required *only* for documents that are "otherwise discoverable."  The text of the Rule has thus long been interpreted to require that a court "first rule on the pending objections and then, if it overrules those objections, give the party claiming privilege an opportunity to log the allegedly privileged documents."  *United States v. Philip Morris, Inc.*, 314 F.3d 612, 621 (D.C. Cir. 2003); *accord Grand River Enter. Six Nations, Ltd. v. Pryor*, 2008 U.S. Dist. LEXIS 86594, at *40-41

(S.D.N.Y. Oct. 22, 2008).   There can be no waiver while the Court is resolving objections; especially where RPS served – as a concession to Plaintiffs – a privilege log in the interim.

Second, Plaintiffs argue that RPS has waived the above privileges based on the content of its privilege log, which Plaintiffs' claim was "scant." (Pltfs' Mem. at p. 17.)   Not so.   Under Guideline 10 of the Local Rules, a privilege log should contain the following information: "(i) the type of document; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document." Each of the documents logged by RPS contains that very information. (Pltfs' Mem. at Ex. 11.)

### III.   Plaintiff is not entitled to discovery on "net worth" at this early posture.

Plaintiffs also seek to compel a "stipulation" of the "net worth" of RPS. (Pltfs' Mem. at p. 20.) Plaintiffs contend that this financial stipulation is relevant to an assessment of the amount of "punitive damages." *Id.*   RPS previously objected to providing the net worth stipulation in this pretrial posture.   However, to resolve the issue, this Court should sustain the objection until at least after summary judgment is decided, and likely until trial.[20]   That proposal strikes a proper balance.   As one court cogently explained:

> [B]y simply inserting a claim for punitive damages in a pleading, a plaintiff should not be able to have *carte blanche* access to the private financial life of a defendant.   A reasonable balance is struck by requiring the Defendants to bring to trial a sworn financial statement, fairly outlining, under the penalty of perjury, the Defendant's assets, liabilities, and net worth.

*Price v. Lockheed Martin Corp.*, 2006 U.S. Dist. LEXIS 49729, at *8-9 (S.D. Miss. June 12, 2006); *see also* 6 Moore's Federal Practice § 26-41[8][c], at 176 (3d ed. 2011) (recognizing

---

[20] RPS produced a balance sheet of its net worth in the matter of *Brian Taylor v. CoreLogic SafeRent, LLC* (E.D. Va. 2015).   Since that time, RPS has learned that the number disclosed was too high, which is a product of the complications that arise when determining net worth in the context of a non-public subsidiary.   In the *Taylor* case, the production was ordered when trial was to be held in a matter of months.   Here, no trial date has been set, and summary judgment briefing will stretch well into 2017.

courts "have deferred discovery of the defendant's financial information until it appears that the defendant will be liable for punitive damages").  Courts also have followed that approach in the context of the FCRA.  *See, e.g.*, *Edeh v. Equifax Info. Servs., LLC*, 2013 U.S. Dist. LEXIS 60421, at *7-9 (D. Minn. April 29, 2013).  Plaintiff's Motion to Compel should be denied.

### IV.    No response to Interrogatory No. 13 is proper or required at this time.

Plaintiffs argue RPS should be required to provide a response to Interrogatory No. 13, which is as follows:  "State in full detail and identify and describe all evidence to support your denial that the Plaintiffs' action does not meet any specific element of Rule 23 sufficient to certify the case as a class action . . . ."  RPS objected to providing a response to that omnibus interrogatory, which is compound and implicates over twenty separate issues under the Rule 23(b) and (b) factors across the three classes, thereby exceeding the numerical limits agreed to by the parties (among other issues).  The Court should sustain RPS's objections.

Courts also have wide discretion to decide whether and when a party must answer contention interrogatories.  Fed. R. Civ. P. 33(a)(2) provides that "the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time."  For that reason, courts have consistently held that defendants need not provide responses to class certification contention interrogatories, if at all, until after discovery has substantially completed.  *See, e.g., Slavkov v. Fast Water Heater Partners I, LP*, 2015 U.S. Dist. LEXIS 148369, 6-8 (N.D. Cal. Oct. 30, 2015) ("At this stage of the litigation, requiring the Defendants to 'state all facts' amounts to requiring Defendants to give Plaintiffs a preview of Defendants' opposition to class certification.").   That is especially true for a defendant like RPS, which does not bear the burden of proof on any element under Rule 23.  Thus, RPS's objections should be sustained.

**V.      Plaintiffs' objections to RPS's ESI review process are unfounded.**

Plaintiffs finally take issue with the nature of RPS's ESI review process, which consumed over 175 hours.  Plaintiffs seek an order requiring RPS to identify: (1) the custodians who were included in the ESI search; (2) the search terms used; and (3) an identification of the vendor that assisted in the search.  (Pltfs' Mem. at pp. 26-27.)  All of that information was previously provided to Plaintiffs' counsel well in advance of this filing of this Motion.  *See* Ex. 3.

Lastly, Plaintiffs claim that RPS has not indicated when it has withheld documents that would be otherwise responsive to Plaintiffs' requests for production.  (Pltfs' Mem. at pp. 26-27.) That is untrue.  For each request where RPS was withholding documents, RPS indicated as such with a withholding statement.  (*See generally* Pltfs' Mem. at Ex. 2.)  RPS's privilege logs also itemized the documents being withheld.  The non-production of the databases and algorithms, which were also the subject of specific objections and withholding statements, also is obvious.

## CONCLUSION

Defendant, CoreLogic Rental Property Solutions, LLC, requests that the Court: (1) deny Plaintiffs' Motion to Compel; and (2) grant RPS any such further relief as may be appropriate.

Dated: August 29, 2016

**CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC**

Respectfully submitted,

By:/s/_____

S. Mohsin Reza (Bar No. 19015)
TROUTMAN SANDERS LLP
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, Virginia 22 182
Telephone:(703)734-4334
Facsimile:  (703) 734-4340
mohsin.reza@troutmansanders.com

Ronald I. Raether, Jr.*
TROUTMAN SANDERS LLP
5 Park Plaza Ste 1400
Irvine, CA 92614
Telephone: (949) 622-2722
Facsimile: (949) 622-2739
ronald.raether@troutmansanders.com

Timothy J. St. George*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1254
Facsimile:  (804) 698-6013
tim.stgeorge@troutmansanders.com
*admitted pro hac vice

*Counsel for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

On August 29, 2016, a true and correct copy of the foregoing has was served via the

Court's Electronic Case Filing system, which will send a notice of electronic filing to:

Kristi C. Kelly
Kelly & Crandall, PLC
4084 University Drive, Suite 202A
Fairfax, VA  22030
Telephone:  (703) 424-7576
Facsimile:  (703) 591-0167
Email:  kkelly@kellyandcrandall.com

E. Michelle Drake (MN Bar No.0387366)*
John G. Albanese (MN Bar No.0395882)*
Berger & Montague, PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
emdrake@bm.net
jalbanese@bm.net

*admitted *pro hac vice*

*Counsel for Plaintiffs*

By:<u>/s/</u>_____
Timothy J. St. George*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1254
Facsimile:  (804) 698-6013
tim.stgeorge@troutmansanders.com

*Counsel for Defendant*

29095868v1

37